DECISION
On January 17, 1995, at approximately 6:30 p.m., an accident occurred at the intersection of State Route 601 ("S.R. 601") and U.S. 20 in Huron County, Ohio. Appellant, Heather Jeska ("Jeska"), who was sixteen at the time, was one of five passengers in a car driven by Michael Proudt. Proudt was travelling southbound on S.R. 601 and did not see the stop sign at the intersection because it had been run over earlier that day and was flat on the ground. When Proudt entered the intersection, his vehicle was hit broadside by a large truck pulling a trailer. Jeska suffered severe injuries and sued appellant, State Farm Fire and Casualty Company ("State Farm"), in Erie County. After a jury trial, Jeska received $300,000 and assigned her rights to State Farm.
Jeska and her parents, appellants, Katherine E. Scheid and Randy Jeska ("parents"), also filed a complaint against appellee, the Ohio Department of Transportation ("ODOT"), alleging negligence and maintenance of a nuisance. State Farm filed an action against ODOT based on its subrogation rights and alleged negligence and the maintenance of a nuisance. The actions were consolidated and the issues of liability and damages were bifurcated.
Appellants alleged that ODOT was negligent in the design, placement and maintenance of the traffic control devices on S.R. 601 because it caused the stop sign for southbound traffic on S.R. 601 to be placed in a position where it could be, and repeatedly was, hit and knocked down, thereby rendering it ineffective to control traffic. Appellants alleged that ODOT's negligence was the proximate cause of the accident and Jeska's injuries.
The Ohio Court of Claims found that appellants had failed to prove that ODOT abused its discretion in determining the location of the stop sign and also failed to prove that, if appellee breached its duty to appellants, such breach was the proximate cause of Jeska's injuries. The court also found that appellants failed to prove by a preponderance of the evidence that appellee created a public nuisance.
Jeska and her parents, along with State Farm, filed a notice of appeal. The appeals have been consolidated and appellants raise the following assignments of error:
 I. THE TRIAL COURT ERRED IN HOLDING THAT DEFENDANT APPELLEE ODOT EXERCISED REASONABLE ENGINEERING JUDGMENT IN PLACING THE STOP SIGN, LOCATED AT THE STATE ROUTE 601 AND U.S. 20 INTERSECTION, BECAUSE THIS DECISION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.
 II. THE TRIAL COURT ERRED IN ASSUMING ARGUENDO THAT IF DEFENDANT-APPELLEE BREACHED ITS DUTY TO MAINTAIN THE STATE ROUTE 601 AND U.S. 20 INTERSECTION IN A REASONABLY SAFE CONDITION, PLAINTIFFS-APPELLANTS FAILED TO PROVE THAT SUCH BREACH WAS THE PROXIMATE CAUSE OF THEIR INJURIES BECAUSE THIS FINDING WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.
 III. THE TRIAL COURT ERRED IN HOLDING THAT PLAINTIFFS-APPELLANTS FAILED TO PROVE THAT DEFENDANT-APPELLEE ODOT CREATED A PUBLIC NUISANCE BY ITS PLACEMENT OF THE STOP SIGN LOCATED AT THE INTERSECTION OF S.R. 601 AND U.S. 20 BECAUSE THE DECISION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.
The assignments of error are related and will be addressed together. Appellants contend that the trial court's findings were against the manifest weight of the evidence.
Judgments which are supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, syllabus. A nuisance in these circumstances is a condition within ODOT's control which creates a danger for ordinary traffic on the regularly traveled portions of the road. Manufacturer's Natl. Bank of Detroit v.Erie Cty. Road Comm. (1992), 63 Ohio St.3d 318, 323.
In order to prevail upon their claim of negligence, appellants were required to prove by a preponderance of the evidence that ODOT owed them a duty of care, that it breached that duty and that the breach proximately caused their injuries.Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 285.
ODOT has a responsibility to construct and maintain state highways in a reasonably safe condition and, therefore, ODOT owed appellants a duty. White v. Ohio Dept. of Transp. (1990),56 Ohio St.3d 39, 42. ODOT's duty to maintain state highways in a reasonably safe condition is further defined by the Manual of Uniform Traffic Control Devices ("manual"), which was adopted and utilized by ODOT. The manual "mandates certain minimum safety measures." Leskovac v. Ohio Dept. of Transp. (1990), 71 Ohio App.3d 22,27. R.C. 4511.10 and 4511.11(D) require that traffic control devices placed upon state highways conform to the manual's specifications. Leskovac, at 27; however, the state is not an insurer of the safety of its highways. Knickel v. Dept. ofTransp. (1976), 49 Ohio App.2d 335, 339.
Pursuant to Pierce v. Ohio Dept. of Transp. (1985),23 Ohio App.3d 124, the state is liable in damages for accidents which are proximately caused by its failure to conform to the requirements of the manual. See, also, Lumbermens Mut. Cas. Co.v. Ohio Dept. of Transp. (1988), 49 Ohio App.3d 129, 130. InPerkins v. Ohio Dept. of Transp. (1989), 65 Ohio App.3d 487, this court determined that not all portions of the manual are mandatory and, therefore, some areas are within the discretion and engineering judgment of ODOT. This finding is consistent with the manual itself, which, at Section 1E, in effect at the time of Jeska's accident, provided as follows:
 In the Manual sections dealing with the design and application of traffic control devices, the words "shall", "should", and "may" are used to describe specific conditions concerning these devices. To clarify the meanings intended in this Manual by the use of these words, the following definitions apply:
* * *
 (b) SHOULD — An advisory condition. Where the word "should" is used, it is considered to be advisable usage, recommended but not mandatory.
Also, Section 2E-5 sets forth the guidelines at issue in this case, as follows:
 Signs should have the maximum practical lateral clearance from the edge of the traveled way for the safety of motorists who may leave the roadway and strike the sign supports. * * *
 Normally all signs should be (a) not closer than 6 feet from the edge of a paved or usable shoulder or (b) a minimum of 12 feet from the edge of the roadway pavement, whichever is greater. * * *
Appellants have conceded that appellee has discretion in determining the location of the stop sign since the language in the manual is advisory; however, they contend that appellee abused its discretion in this case. The trial court found that appellee did not abuse its discretion because it exercised reasonable engineering judgment in placing the stop sign.
In 1987, appellee conducted an engineering study of the intersection. The purpose of the study was to determine whether a stop-and-go traffic light was warranted but the results indicated that one was not. As the result of that study, appellee increased the size of the stop sign from thirty-six inches to forty-eight inches, moved the sign closer to S.R. 601, placed a flashing red light on top of the sign and placed a "Stop Ahead" sign to signal the upcoming stop sign. The ODOT civil engineer responsible for the maintenance and direction of signs, signals and pavement markings, Larry Stormer, testified that he was concerned about the visibility of the sign. An informational sign and a tree hindered the possibilities for placement. Stormer testified that an overhead flasher signal was considered but rejected. (Tr. Vol. II, 194.)
In 1993 or 1994, ODOT repaved S.R. 601 and changed the gravel shoulder to a paved shoulder. This effectively caused the stop sign to be closer to the paved surface by approximately two feet. Stormer was unaware of the widening project. (Tr. Vol. I, 100.) However, he testified that, if he had been aware of the project, he would have inspected the location to place the sign in the most visible location. (Tr. Vol. I, 103-104.) After the paving project, the lateral clearance of the sign was approximately 2.8 feet as measured from the edge of the pavement to the edge of the sign. (Tr. Vol. I, 175.) This is not within the recommendation of the manual, which calls for the greater of six feet from the paved shoulder or twelve feet from the edge of the roadway pavement.
Appellants contend that appellee abused its discretion in placing the sign because the lateral clearance was not large enough for a WB50 tractor trailer[1] truck to make a right-hand turn (westbound) from S.R. 601 onto U.S. 20 within its marked lanes without striking the stop sign, thus the sign was continually hit. One of appellants' experts, John H. Hancock, a civil engineer and land surveyor, testified that the traffic on S.R. 601 and U.S. 20 involves a fairly high-volume or high percentage of truck traffic. (Tr. Vol. I, 201.) Hancock and another expert, John Stemley, who is also a civil engineer, both concluded that the stop sign was placed too close to the pavement and there were other adequate alternatives for placement where the sign was less likely to be hit. (Tr. Vol. I, 197-198; Vol. II, 43-44.) Stemley testified that the two other alternatives were within the manual recommendations. (Tr. Vol. II, 45-46.) The testimony at trial established that, in 1995, after this accident the sign was moved eleven feet to the north, which is outside the turning radius of trucks but still visible. This after-the-fact location was one of the recommendations of the experts.
In addition to the other alternative locations suggested by appellant's experts, Stormer testified that an overhead flasher with a yellow light flashing on U.S. 20 and a red light flashing on S.R. 601 was considered but was rejected. (Tr. Vol. II, 195.) The tree that might have obscured visibility could have been trimmed by ODOT. (Tr. Vol. II, 236.) Stormer also testified that he did not measure or consider the turning radius of trucks when determining placement of the stop sign (Tr. Vol. II, 219) and, in fact, he stated that he determined the stop sign location by driving through the intersection in 1988 without conducting any tests of measurement. (Tr. Vol. I, 106-107.) Another alternative available to ODOT included moving the information sign rather than the stop sign. According to the manual, the stop sign, being a regulatory sign is of the highest priority and higher rank than a directional sign. (Tr. Vol. II, 228.) Appellants contend that the lower priority sign should have been moved, but Stormer testified that he tries to make both signs visible. (Tr. Vol. II, 228-229.) Stormer admitted that he had knowledge that the stop sign had been knocked down in August 1994. (Tr. Vol. I, 132.) The maintenance records are not clear but demonstrate that, at least on six occasions (May 8, 1989; May 12, 1989; June 16, 1989; January 8, 1990; October 3, 1990; and November 8, 1990), flat-sign maintenance work was completed in the area of the intersection. On June 16, 1989, two stop signs at the intersection were replaced. (Tr. Vol. I, 136-148; Plaintiff's Exhibit 15.) Given these facts, ODOT did not exercise reasonable engineering judgment in placing the stop sign outside of the manual's recommendation and the trial court erred in so finding.
The trial court also erred in finding that appellants failed to prove that ODOT's breach of its duty was the proximate cause of their injuries. There is no question here that the accident was caused because the stop sign was down and not visible. The trial court found that, since appellants could not prove how the sign was knocked over, appellants failed to carry their burden of proof. However, two experts testified that, in their professional judgment, the stop sign was knocked down by a dual rear-wheel vehicle, probably a truck. (Tr. Vol. I, 201, Hancock.) In fact, Stemley testified that it was knocked down by a WB50 tractor-trailer truck attempting to turn right onto U.S. 20 (westbound) and still remain in its designated lane. (Tr. Vol. II, 63.)
These opinions are based on the photos taken in connection with the accident report in which scratches on the sign and dual rear tire tracks are visible running through the sign support. (Tr. Vol. I, 200; Vol. II, 54-55.) The experts were asked whether it was possible that another vehicle knocked down the sign and a WB50 truck then ran over it. While possible, neither expert believed that scenario very likely. The two state troopers, who testified, both believed that a commercial motor vehicle or semi tractor-trailer knocked down the sign. (Tr. Vol. II, 121; 155.) Although the trial court relied upon these two state troopers' testimony that neither one had seen the sign down before this accident, the trial court ignored their testimony concerning their conclusions as to the cause of the stop sign being down. The trial court also failed to note that Stormer admitted that the stop sign was knocked down at least once prior to this accident (August 1994).
Given the overwhelming amount of evidence in this case, the judgment is against the manifest weight of the evidence. Appellants' assignments of error are well-taken.
For the foregoing reasons, appellants' three assignments of error are sustained and the judgment of the Ohio Court of Claims is reversed, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this decision.
Judgment reversed and cause remanded.
BROWN and KENNEDY, JJ., concur.
[1] WB50 is a national designation of a large over-the-road type tractor-trailer unit. "50" designates the wheel base length from the front axle of the tractor to the rear axle of the trailer. (Tr. Vol. I, 202.)